1  CHRIS BAKER, State Bar No. 181557
   cbaker@bakerlp.com
2  MICHAEL CURTIS, State Bar No. 252392
   mcurtis@.bakerlp.com
3  **BAKER CURTIS & SCHWARTZ, P.C.**
   1 California Street, Suite 1250
4  San Francisco, CA 94111
   Telephone: (415) 433-1064
5  Facsimile: (415) 366-2525
6  Attorneys for Plaintiff

7                      UNITED STATES DISTRICT COURT

8          NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

9

10

11 ADRIAN MORRIS, on behalf of herself and        Case No. 3:17-cv-06027-WHA
   all others similarly situated,
12                                                **NOTICE OF MOTION AND MOTION**
                  Plaintiff,                      **FOR PRELIMINARY APPROVAL OF A**
13                                                **CLASS ACTION SETTLEMENT AND**
           vs.                                    **APPROVAL OF A COLLECTIVE**
14                                                **ACTION SETTLEMENT UNDER THE**
                                                  **FLSA**
15 FIDELITY INVESTMENTS, a legal entity of
   an unknown form, FMR, LLC, a Delaware
16 limited Liability Company, FIDELITY            Judge: Hon. William H. Alsup
   BROKERAGE SERVICES LLC, a Delaware             Date:  January 24, 2019
17 Limited Liability Company (collectively        Time: 8:00 a.m.
   "FIDELITY"),                                   Ctrm: 12 – 19th Floor
18
19                Defendants.

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page No.

Notice Of Motion ................................................................................................. 1

Statement Of Issues To Be Decided ..................................................................... 1

Memorandum Of Points And Authorities ............................................................. 1

I.   INTRODUCTION ......................................................................................... 1

II.  BRIEF STATEMENT OF FACTUAL ALLEGATIONS AND CLAIMS ........... 2

III. THE CALIFORNIA CLASS AND NATIONWIDE FLSA COLLECTIVE ......... 4

IV. PROCEDURAL HISTORY ............................................................................ 4

V.  SUMMARY OF THE AGREEMENT ............................................................. 6

VI. ARGUMENT ................................................................................................ 9

    A.   The Court Previously Certified The Settlement Class As
        A Litigation Class And The Settlement Releases The Same
        Claims Alleged In The Lawsuit ........................................................ 9

    B.   The Settlement Meets The Standards For Preliminary Approval
        Under Rule 23(e), the Northern District's Procedural Guidance
        And This Court's Standing Order ...................................................... 10

        1.   The Class/Collective Greatly Benefits From $1,200,000
            And Fidelity's Changing Its Pay Practices .............................. 12

        2.   All Funds Will Be Distributed To Class Members .................. 13

        3.   The Potential Recovery Of Damages In This Action
            Is Less Than The Gross Settlement Amount And Penalties
            Would Be Difficult To Recover .............................................. 13

            a.   Bonus Overtime Claim ................................................. 15

            b.   Reimbursement Omission Overtime Claim ................... 16

            c.   Potentially Implicated Penalties By The Class Claims ... 16

            d.   PAGA Claim ................................................................. 17

i

4.   Plaintiff Performed The Necessary Due Diligence, Including Formal Discovery, To Assess And Resolve This Case Without Wasting Class Resources .......................................................................... 18

5.   The Settlement Specifically Limits The Release And Explains Its Overlap With The One Other Pending Related Lawsuit .......................................................................... 19

6.   The Settlement Leaves The Award Of Attorneys' Fees, Costs And Enhancement Payment Entirely To Court's Discretion And Assumes Only The 25% Benchmark For Estimating Class Member Recoveries ............................... 20

C.   The FLSA Settlement and Release Is Fair and Reasonable ................ 21

D.   The Settlement Administrator ...................................................... 22

E.   Class, Collective and CAFA Notice .............................................. 23

F.   Proposed Orders .......................................................................... 25

VII.   CONCLUSION ............................................................................................. 25

1

**TABLE OF AUTHORITIES**

2

**Page No.**

3

**Cases**

4

*Alonzo v. Maximus, Inc.*, 832 F. Supp. 2d 1122 (C.D. Cal. 2011) ........................................ 10, 17

5

*Alvarado v. Dart Container Corp. of California*, 4 Cal. 5th 542 (2018) ................................. 3, 15

6

*Adoma v. Univ. of Phoenix, Inc.*, 913 F. Supp. 2d 964 (E.D. Cal. 2012) ............................. 15, 16

7

*Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 2010) ...................................... 11

8

*Cicero v. DirecTV, Inc.*, 2010 WL 2991486 (C.D. Cal. July 27, 2010) ............................... 19, 20

9

*Chu v. Wells Fargo Investments, LLC*, 2011 WL 672645 (N.D. Cal. 2011) .............................. 18

10

*Dunn v. Teachers Ins. & Annuity Ass'n of Am.*,
11
        2016 WL 153266 (N.D. Cal. Jan. 13, 2016) ................................................................. 21

12

*Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117 (2016) ...................................................... 16

13

*Ferreri v. Bask Technology, Inc.*, 2016 WL 6833927 (S.D. Cal., Nov. 21, 2016) ..................... 20

14

*Flores v. City of San Gabriel*, 824 F.3d 890 (9th Cir. 2016) ..................................................... 16

15

*Franco v. Ruiz Food Products, Inc.*, 2012 WL 5941801 (E.D. Cal. 2012) .......................... 18, 25

16

*Garibaldi v. Bank of America, N.A.*,
17
        Case No. 13-cv-02223 (Dkt. 108) (N.D. Cal. August 8, 2015) ...................................... 18

18

*Goodwin v. Citywide Home Loans, Inc.*,
19
        2015 WL 12868143 (C.D. Cal. Nov. 2, 2015) ............................................................... 22

20

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998) ......................................................... 20

21

*Herman v. Anderson Floor Co.*, 11 F. Supp. 2d 1038 (E.D. Wis. 1998) ................................... 15

22

*In re Heritage Bond Litigation*, 2005 WL 1594403 (C.D. Cal. 2005) ....................................... 11

23

*In re Global Crossing Securities and ERISA Litigation*,
24
        225 F.R.D. 436 (S.D.N.Y. 2004) ............................................................................. 12, 15

25

*In re Omnivision Technologies, Inc.*, 559 F.Supp.2d 1036 (N.D. Cal. 2008) ............................ 18

26

*In re Pac Enters Sec. Litig.*, 47 F.3d 373 (9th Cir. 1995) ........................................................... 11

27

*In re Tableware Antitrust Litigation*, 484 F.Supp.2d 1078, 1080 (N.D. Cal. 2007) ................... 11

28

iii

*Johnson v. Quantum Learning Network, Inc.*, 2016 WL 8729941 (N.D. Cal., Aug. 12, 2016) ...25

*Kempen v. Matheson Tri-Gas, Inc.*, 2016 WL 4073336 (N.D. Cal., Aug. 1, 2016) ) ................25

*Lazarin v. Pro Unlimited, Inc.*, 2013 WL 3541217 (N.D. Cal. 2013) ...................................21, 25

*Lee v. The Timberland Co.,* 2008 WL 2492295 (N.D. Cal. June 19, 2008) ................................22

*Linney v. Cellular Alaska P'ship*, 151 F.3d 1234 (9th Cir. 1998) .....................................1, 15, 18

*Lynn's Food Stores, Inc. v. U.S. By and Through U.S. Dep't of Labor*,
     679 F.2d 1350, 1352 (11th Cir. 1982) ............................................................21

*McKeen-Chaplin v. Franklin Am. Mortg. Co.*,
     2012 WL 6629608 (N.D. Cal. Dec. 19, 2012) ...................................................22

*Millan v. Cascade Water Services, Inc.*, 310 F.R.D. 593 (E.D. Cal. 2015) ...........................22,

*Millan v. Cascade Water Services, Inc.*, 2016 WL 3077710 (E.D. Cal. Nov. 21, 2016)............22

*Minor v. FedEx Office & Print Services, Inc.*,
     2013 WL 503268 (N.D. Cal. 2013) ...................................................................12

*Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781 (7th Cir. 2004) .....................................14

*Murillo v. Pacific Gas & Elec. Co.*, 266 F.R.D. 468 (E.D. Cal. 2010) .........................10

*Otey v. Crowdflower, Inc.*, 2014 WL 1477630 (N.D. Cal. Apr. 15, 2014) ................................22

*Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948 (9th Cir. 2009) ........................................10, 14, 23

*Saravia v. Dynamex Operations West, LLC*,
     2017 WL 1295069 (N.D. Cal., Apr. 7, 2017) ..................................................10

*Savani v. URS Professional Solutions LLC*, 2014 WL 172503, *9 (D.S.C. 2014) ....................14

*Slavkov v. Fast Water Heater Partners I, LP*,
     2017 WL 3834873 (N.D. Cal., July 25, 2017) ................................................22

*Smith v. Lux Retail North America, Inc.*,
     2013 WL 2932243 (N.D. Cal., June 13, 2013) ...............................................17

*Sobel v. Hertz Corporation*, 2014 WL 5063397 (D. Nev. 2014). ...................................14

*Staton v. Boeing Co.*, 327 F.3d 938 (9th Cir. 2003) .......................................................12

iv

*Stearne v. Heartland Payment Systems LLC*,
    2018 WL 746492 (E.D. Cal., Feb. 6, 2018) ....................................................... 17

*Titus v. McLane Foodservice, Inc.*,
    2016 WL 4797497 (E.D. Cal. Sep. 13, 2016) ................................................. 18

*Villegas v. J.P. Morgan Chase & Co.*,
    2012 WL 5878390, (N.D. Cal. Nov. 21, 2012) ............................................... 19

*Yue Zhou v. Wang's Restaurant*, 2007 WL 2298046 (N.D. Cal. Aug. 8, 2007) ........................... 21

*Williams v. Costco Wholesale Corp.*,
    2010 WL 761122 (S.D. Cal. 2010) ................................................................. 11


**Statutes and Other Authorities**

29 U.S.C. § 207 ................................................................................................................ 16

29 U.S.C. § 260 ................................................................................................................ 17

California Labor Code § 203 ............................................................................................ 17

California Labor Code § 204 ............................................................................................ 17

California Labor Code § 226 ............................................................................................ 17

California Labor Code § 246 ............................................................................................ 18

California's Private Attorneys General Act, Labor Code § 2698 *et seq.* ...................... 18

Division of Labor Standards Enforcement ("DLSE") Manual section 5.2.4 .............. 18

Federal Rules of Civil Procedure, Rule 23 ............................................................*passim*

Federal Rules of Civil Procedure, Rule 23, Advisory Committee Notes ........................... 9-12, 23

Social Security, Understanding the Benefits (2015) ........................................................ 6

v

MOTION FOR PRELIMINARY APPROVAL OF A CLASS ACTION SETTLEMENT AND APPROVAL OF A
COLLECTIVE ACTION SETTLEMENT UNDER THE FLSA (Case No. 3:17-cv-06027)

**PLEASE TAKE NOTICE** that on January 24, 2019 at 8:00 a.m., before the Honorable William H. Alsup of the United States District Court for the Northern District of California, located at 450 Golden Gate Avenue, San Francisco, California, 94102, Plaintiff Adrian Morris will and hereby does move the Court for an order, pursuant to Rule 23(e) of the Federal Rules of Civil Procedure: (1) Preliminarily approving the Class Settlement in this action; (2) Approving of the manner and form of notice to be sent to Class Members; and (3) Scheduling a hearing for consideration of final approval of the Class Settlement.  Plaintiff also moves the Court for an order approving the settlement of the Collective claims under the Fair Labor Standards Act.

This Motion is based on this Notice of Motion, the Memorandum of Points and Authorities attached to this Motion, the Declarations, their Exhibits, all pleadings and papers filed herein, the arguments of counsel, and any other matters properly before the Court.

## STATEMENT OF ISSUES TO BE DECIDED (Civil L.R. 7-4(a)(3))

1.      Should the Court preliminarily approve the settlement of the class claims in this Action and order notice provided via the requested manner and form?

2.      Should the Court approve the FLSA settlement as a fair and reasonable resolution of a bona fide dispute?

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.      INTRODUCTION**

On October 20, 2017, Plaintiff Adrian Morris sued Defendant Fidelity Brokerage Services LLC and other Fidelity entities ("Fidelity") alleging certain wage and hour violations: Most importantly, that Fidelity did not properly calculate its non-exempt employees' regular rate of pay for overtime purposes.

On June 1, 2018, in response to a stipulation of the parties, the Court certified a FRCP Rule 23 California-based Class and a nationwide Fair Labor Standards Act (FLSA) Collective.  (Dkt. 51.) The parties engaged in further discovery and, on September 5, 2018, reached a preliminary settlement at a settlement conference with the Honorable Joseph Spero.  Three months of negotiating the particulars of the settlement followed, with a focus on creating the most efficient mechanisms to

1

ensure that the Class and Collective members receive their settlement payments.

The parties have now finalized their agreement.  In exchange for a release tailored to the facts and claims in this case, Fidelity has agreed to pay a non-reversionary, common fund, settlement of $1,200,000.  This is a fair and reasonable settlement.  The *gross* settlement amount gets the Class and Collective more than one hundred cents on the dollar of their compensatory damages.  The *net* settlement amount (if the Court grants in total Plaintiff's motion for fees, costs, and an incentive payment from the common fund) gets the Class and Collective approximately 76 cents on the compensatory-damages-dollar.  Moreover, while Fidelity does not admit to violating any laws through its past pay practices, it has nevertheless agreed to revise these its practices going forward.

In other words, the settlement nearly makes whole the Class/Collective members for the violations alleged and resolves these alleged violations on a going forward basis.  Accordingly, Plaintiff respectfully requests that the Court preliminarily approve the Rule 23 class action settlement and approve the settlement of the FLSA collective.

## II.   BRIEF STATEMENT OF FACTUAL ALLEGATIONS AND CLAIMS

From approximately August 2015 to September 2017, Plaintiff worked as a nonexempt Financial Representative at Fidelity's Marin, California Investor Center.  (Morris Decl. ¶ 3.)  She filed this action primarily based on her claim that Fidelity failed to properly calculate the regular rate of pay for overtime purposes in three distinct ways.  (*See* FAC ¶¶ 19-34, 59-71.)

**First**, Fidelity included all hours worked in a pay period in determining the overtime rate for bonuses, instead of only non-overtime hours.  More specifically, Fidelity paid Plaintiff (and other California-based non-exempt employees) bonus compensation pursuant to a written compensation plan for Financial Representatives.  (Morris Decl. ¶ 4, Ex. 1.)  Fidelity maintains similar bonus compensation plans in which bonuses are not paid as a percentage of earnings, for approximately 40 other non-exempt positions in California ("Compensation Plans").  (Baker Decl. ¶ 8.)  The bonuses are generally earned quarterly and paid about two months later.  (Morris Decl. Ex. 1.)  Under the Compensation Plans, when Fidelity pays a bonus, it also pays a bonus overtime adjustment as an overtime premium for hours worked during the period the bonus was earned.  The adjustments

2

MOTION FOR PRELIMINARY APPROVAL OF A CLASS ACTION SETTLEMENT AND APPROVAL OF A COLLECTIVE ACTION SETTLEMENT UNDER THE FLSA (Case No. 3:17-cv-06027)

1    appear on employees' wage statements as "Bonus Elig-NAJ," or something similar.[1]  (*Id.* at Ex. 2.)

2            Plaintiff claims that the bonuses are non-discretionary "flat sum" bonuses such that the bonus

3    overtime rate must be based on the number of non-overtime hours in a pay period, as required by the

4    California Supreme Court's decision in *Alvarado v. Dart Container Corp. of California*, 4 Cal. 5th

5    542 (2018).  Fidelity, however, based the bonus overtime rate on <u>all</u> hours worked pursuant to a

6    methodology endorsed by the Department of Labor ("DOL").[2]  (Baker Decl. ¶ 8, Ex. 6.)  Fidelity

7    claims that this method of calculation was lawful because (a) the bonuses were discretionary and

8    thus no bonus overtime was required at all; and (b) even if the bonus was not discretionary, it was

9    not a "flat sum" bonus and so *Alvarado* does not apply and the DOL method is permissible.

10           **Second**, through its "Step Ahead Student Loan Program," Fidelity pays a portion of its

11   employees' student loan debt.  (Morris Decl. ¶ 5; Baker Decl. Ex. 7.)  But, Fidelity did not include

12   these loan repayments in calculating Plaintiff's (or any non-exempt employees') regular rate of

13   pay for overtime purposes.  (Dkt. 47, ¶ 12.)  Plaintiff claims this was improper.  Fidelity disagrees.

14           **Third**, Fidelity maintains a "Fitness Reimbursement Program" through which it

15   reimburses its employees for certain expenses related to physical fitness.  (Morris Decl. ¶5; Baker

16   Decl. Ex. 8.)  Fidelity also did not include these fitness reimbursements in the regular rate

17   calculation.  (Dkt. 47, ¶ 17.)  Plaintiff argues that this was improper as well and Fidelity disagrees.

18            In light of these allegations, Plaintiff's First Amended Complaint ("FAC") asserts a

19   claim for unpaid overtime under California law, a claim for wage statement violations resulting

20   from Fidelity's alleged failure to properly calculate and report overtime rates, and a claim for

21   waiting time penalties on behalf of former employees for the same unpaid overtime.  The FAC

22   also alleges a claim under California's Private Attorneys General Act, Labor Code § 2698 *et seq.*

23   ("PAGA") based on the preceding claims, Fidelity's failure to notify its employees of their

24   accrued sick leave and the alleged late payment of bonuses.  Finally, the FAC alleges a collective

25

---

26   [1] Plaintiff determined through discovery that "Base Comp-Retro" payments identified in the wage
     statements were not bonus adjustments and therefore not relevant to her claims.  (Baker Decl. ¶ 8.)
27   [2] Plaintiff alleged that Fidelity's calculations of the regular rate did not comply with the DOL
28   methodology, but discovery proved this allegation almost certainly wrong.  (Baker Decl. ¶ 8.)

1    claim for unpaid overtime under the FLSA.

2        The settlement in this case resolves these claims on a class and collective basis consistent

3    with the already certified Rule 23 class and FLSA collective.

4    **III.    THE CALIFORNIA CLASS AND NATIONWIDE FLSA COLLECTIVE**

5        The **Rule 23 Class** includes all former and current employees of Fidelity Brokerage in

6    California who satisfied the following two conditions between October 20, 2013 and October 1,

7    2018: (1) Fidelity Brokerage classifies(d) them as "non-exempt"; and (2)(a) they were paid bonus

8    compensation pursuant to a Compensation Plan and were also paid a bonus overtime adjustment

9    with respect to that bonus compensation; and/or (b) they worked overtime during a month in

10   which they received a student loan repayment; and/or (c) they worked overtime during a pay

11   period in which they received a fitness reimbursement.  There are 580 Class members.

12   (Settlement Agreement ("SA") ¶¶ 1.1; 1.3.)

13       The **FLSA Collective** is defined as all United States based former and current employees

14   of Fidelity Brokerage who worked outside of California from May 31, 2015 to October 1, 2018,

15   who satisfy the following two conditions: (1) Fidelity Brokerage classifies(d) them as "non-

16   exempt;" and (2)(a) they worked overtime during a month in which they received a student loan

17   repayment; and/or (b) they worked overtime during a pay period in which they received a fitness

18   reimbursement.  The FLSA Collective consists of 6,950 people.[3]  (SA ¶ 1.23.)

19   **IV.    PROCEDURAL HISTORY**

20       On October 20, 2017, Adrian Morris filed this Litigation as a putative Rule 23 class action on

21   behalf of those allegedly similarly situated in California and a putative national collective action

22   under the FLSA on behalf of those allegedly similarly situated throughout the nation.  Fidelity

23   Brokerage Services LLC answered the complaint.  (Dkt. 18.)  On February 21, 2018, Plaintiff filed a

24   FAC adding a claim for PAGA penalties.  (Dkt. 34.)  Defendant FMR LLC moved to dismiss the

25   FAC arguing that Fidelity Brokerage Services was Plaintiff's sole employer.  (Dkt. 38.)  The Court

26

27   [3] The Class and Collective grew from their estimated sizes at the time of certification to their
     present sizes during the four months of new hires within the class and collective period after the

28   Court certified them on June 1, 2018.

1   denied that motion as to FMR on June 1, 2018, but dismissed defendant Fidelity Investments.  (Dkt.

2   50.)  On June 1, 2018, the Court also certified the Rule 23 Class and FLSA Collective.  (Dkt. 51.)

3   The certified Class and Collective consists of employees who were employed by Fidelity Brokerage.

4   It does not include employees who were employed only by FMR and the FMR-only employees are

5   releasing no claims.  (SA ¶¶ 1.4; 1.14; 1.27).  Among other things, there are no FMR-only

6   employees in California, and, in Class Counsel's considered opinion, the cost and uncertainty to the

7   class/collective of establishing a viable collective that includes FMR-only employees outside of

8   California far outweighed the potential recovery.  (Baker Decl. ¶ 12.)

9        In February 2018, the parties exchanged initial disclosures and Plaintiff served her written

10  discovery, to which Fidelity timely responded.  After an extensive meet and confer process, Fidelity

11  made several document productions, which included the relevant policies, dozens of Compensation

12  Plans, Plaintiff's wage statements, and massive spreadsheets that included all the financial data

13  related to overtime, bonuses, student loan and fitness reimbursements, and other information.  These

14  document are the heart of this case.  (Baker Decl. ¶ 8.)  The compensation plan for Plaintiff's

15  position, exemplars of Plaintiff's wage statements (Morris Decl. Exs. 1 and 2), Fidelity's Business

16  Rules for calculating bonus overtime adjustments, Fidelity's Step Ahead Student Loan Assistance

17  Program Description, and Fitness Reimbursement Program documents (Baker Decl. Exs. 6, 7 and 8),

18  are all submitted in support of this motion, and would constitute key evidence at trial.

19       The class member data pulled from Fidelity's computer systems was substantial (millions of

20  excel cells) and required substantial analysis and extrapolation.  (Baker Decl. Ex. 3, ¶ 6.)   Class

21  counsel retained a data consultant with expertise in managing large datasets and extracting usable

22  information from these sets.  (Baker Decl. Ex. 3.)

23       No settlement discussions were had until after the Class and Collective were certified, and

24  indeed no settlement offers were extended or discussed outside of the settlement conference process.

25  After further discovery, preparing a damages analysis, and with the risks of certification resolved,

26  the parties negotiated a settlement resolving the claims of the Class and Collective at a settlement

27  conference with Judge Spero on September 5, 2018.  Three months of further negotiating the

28

MOTION FOR PRELIMINARY APPROVAL OF A CLASS ACTION SETTLEMENT AND APPROVAL OF A
COLLECTIVE ACTION SETTLEMENT UNDER THE FLSA (Case No. 3:17-cv-06027)

1  settlement followed before the parties finalized their agreement.  (Baker Decl. ¶ 13.)

2  **V.      SUMMARY OF THE AGREEMENT**

3         On December 14, 2018, the parties executed the Settlement Agreement, a copy of which is

4  attached to the Baker Declaration as Exhibit 1.  The Agreement requires Fidelity to pay $1,200,000

5  into a non-reversionary Settlement Fund.  (SA ¶ 1.19)  It also requires Fidelity to separately pay the

6  employer's share of payroll taxes arising out of any settlement payments. (SA ¶ 2.1.1)[4]

7         The Agreement provides for deductions from the common fund prior to disbursement to the

8  Class/Collective members, but the only such deduction set by the Agreement is the $15,000 amount

9  to be paid to the California Labor and Workforce Development Agency ("LWDA") pursuant to

10 PAGA.  (SA ¶ 1.19.)  The Agreement acknowledges that Class Counsel will move the Court to

11 award from the common fund the following: Attorneys' fees, reimbursement of litigation costs, an

12 enhancement payment to Plaintiff for her service in this case, and payment to the claims

13 administrator (who has agreed to cap its fee at $41,887).  These amounts are left to the Court's

14 discretion in accordance with applicable law.

15        The Agreement labels the net amount after deductions as the Total Settlement Portion for

16 Payments to Class and Collective Members, and divides that amount into the Settlement Portion for

17 Payments to California Settlement Class Members and the Settlement Portion for Payments to

18 National FLSA Collective Members.  (SA ¶¶ 1.19-1.21)  Each Class member gets a pro rata share of

19 the Class portion and each Collective member gets a pro rata share of the Collective portion.

20        In order to make the pro-rata distribution, the parties calculated the <u>actual</u> amount of unpaid

21 wages each Class/Collective member would receive if Plaintiff established her claims.  This is the

22 Individual Claim Amount.  (SA ¶¶ 1.7.1; 1.28.1)  Each Individual Claim Amount is then multiplied

23 by one of two "Settlement Variables."  The National Settlement Variable is "the fraction that when

24 multiplied by the total of all National Individual Claim Amounts equals the maximum Settlement

26 ───────────────
[4] These payroll taxes (at least with respect to Social Security) directly benefit the class.  The
27 amount of money contributed to Social Security on behalf of an employee correlates with the
amount of money the employee eventually receives from Social Security.  *See,* SOCIAL SECURITY,
28 UNDERSTANDING THE BENEFITS (2015) at 8-9 (http://www.ssa.gov/pubs/EN-05-10024.pdf).

Portion for Payments to National FLSA Collective Members."  The California Settlement Variable is equal to the National Settlement Sum Variable plus ten percent, based on the higher value of claims released by the class, including potential penalties under Labor Code section 226, PAGA and releasing FLSA claims (if the Class members cashes his or check).  (SA ¶¶ 1.7.2; 1.28.2)  If the Court awards the requested deductions (i.e. the requested fee, cost and enhancement awards), the California Settlement Variable will be 0.78967 and the National Settlement Variable will be 0.71788  These variables are then multiplied by the Individual Claim Amounts to get the amounts Class/Collective members would actually recover under the settlement.  For example, under the 0.78967 California Settlement Variable (if the Court awards the requested deductions), a class member who would be paid an additional $7,075.29 in wages <u>if</u> Plaintiff won at trial will receive a settlement payout of $5,587.12.  In other words, he or she will receive about 79 cents on the dollar.

The Claims Administrator will mail each California Class member a class notice 30 days after the Court grants preliminary approval.  (SA ¶ 1.29.)  California Class members who do not opt-out ("California Settlement Class Members") will release all claims:

> that accrued during the California Class Period as a result of the California Class Member's employment as a non-exempt employee in California for Fidelity Brokerage and Fidelity Brokerage's alleged failure to properly calculate the regular rate used to pay overtime wages and/or provide notice of sick leave benefits, including claims for (a)(i) failure to pay regular rate adjustments; (ii) associated failure to comply with payroll or wage record-keeping or wage statement itemization requirements; and (iii) associated failure to timely pay wages due at termination; and (b) failure to provide sick leave notice pursuant to California Labor Code section 246(i) … that arise from the facts alleged in the First Amended Complaint in the Litigation.  (SA ¶¶ 1.4-1.5)[5]

That said, the California Settlement Class Members only release their FLSA claim if they actually cash their checks.  (*Id.*)  Moreover, California Settlement Class Members who do not cash

---

[5] Knowing that Fidelity faces overlapping litigation in another jurisdiction, Plaintiff ensured that the Agreement specifically states that neither the California nor FLSA release extended to claims in that lawsuit that were beyond the facts alleged here: "Released Claims do not include the claims for unpaid pre-shift work asserted in *Reynolds et al. v Fidelity Investments Operations Company, Inc. et al.*, Case No. 1:18-CV-00423-CCE-LPA (M.D. N.C.)"  (SA ¶¶ 1.4; 1.27)

1    their checks are only subject to the Class release if they actually received them.[6]  (SA ¶ 2.6.3)

2        The Agreement further provides for sending the FLSA Collective members a live check at

3    the same time that Class members' checks are sent.  A short-form notice will be attached to the

4    check, explaining that cashing the check constitutes opting into the action, along with a statement

5    directing them to a website with a long form notice about the settlement.  (SA ¶ 2.6.2)  This

6    provision is designed to minimize administrative expenses while maximizing the likelihood that the

7    recipient will join the action.  Those who do not cash the check will never have been parties to the

8    action and the judgment will not affect them.  (*Id.*)  To ensure that each FLSA Collective member

9    gets an opportunity to cash his or her settlement check and join the action, if that is his or her desire,

10   the Claims Administrator will send a postcard reminder and then a second live check after the first

11   check expires to anyone who did not cash the first check, after again attempting to verify their

12   addresses.  These people need not contact anyone to request another check.[7]  (*Id.*)

13       The FLSA Collective members who cash their checks will release all claims that:

14       accrued during the National Class Period as a result of the National FLSA
         Collective Member's employment as a non-exempt employee in any state other

15       than California and for Fidelity Brokerage's alleged failure to properly calculate
         the regular rate used to pay overtime, including without limitation claims under

16       the FLSA, the Portal to Portal Act and associated claims for interest, liquidated
         damages or any other remedies… that arise from the facts alleged in the First

17       Amended Complaint…  (1.27)

18       Another feature of the Agreement designed to enable Class/Collective members to receive as

19   much of the settlement as possible is its omission of a reserve fund.  This means none of the net

20   settlement sum goes to a third party.  Instead, the amount of any unclaimed National Settlement

21   Sums will be redistributed to currently-employed FLSA Collective members through Fidelity's

22   payroll system on a pro rata basis.[8]  (SA ¶ 2.6.3)  The equivalent will also be done for the Class.  To

23

24   [6] In any dispute over whether a California Settlement Class member received his or her check, the
     burden shall be on Fidelity to prove that he or she did.  Fidelity shall be entitled to a presumption,

25   rebuttable upon counter-proof, that the Settlement Class Member received his or her check, if it
     can show that all required address verification measures were taken and that the final check was

26   sent to the address consistent with those measures.  (SA ¶ 2.6.3)

27   [7] This will also be the procedure for Class members' settlement checks.  (SA ¶ 2.6.3)
     [8] The Agreement provides that this additional payment does not effectuate a release but reserves to

28   Fidelity the right to argue offset to a future claim in this amount.  (SA ¶ 2.6.3)

1  ensure this distribution is completed, the Claims Administrator will inform Class Counsel of the total

2  amount of money from uncashed checks, and once that amount is distributed, Fidelity will provide

3  Class Counsel a declaration confirming that such distribution took place.  (SA ¶ 2.6.3)

4       Finally, Fidelity agreed to pay regular rate "true-up" payments to its non-exempt employees

5  in connection with payments made pursuant to its current student loan benefit program and current

6  fitness reimbursement benefit program, and to calculate the true-up payments it makes to California

7  non-exempt employees under the Compensation Plans pursuant to *Alvarado*.  (SA ¶ 2.11.4)

8  **VI.   ARGUMENT**

9      **A.   The Court Previously Certified The Settlement Class As A Litigation Class
   And The Settlement Releases The Same Claims Alleged In The Lawsuit**

10      On June 1, 2018, the Court ordered certified, pursuant to Federal Rules of Civil Procedure

11  ("FRCP"), Rule 23(b)(2) and (3), the following class:

12  > All former and current employees of Fidelity Brokerage Services who, while
13  > employed by Fidelity Brokerage Services in California at some point during the
    > period from October 20, 2013 to the present, satisfied the following two
14  > conditions:  (1) Fidelity Brokerage Services classified them as "non-exempt;"
    > **and** (2)(a) They were paid bonus compensation pursuant to a Compensation
15  > Plan and were also paid a bonus overtime adjustment with respect to that bonus
    > compensation; **and/or** (b) They received student loan repayments pursuant to
16  > Fidelity Brokerage's Step Ahead Student Loan Program and worked overtime
    > during the month in which a student loan repayment was made; **and/or** (c) They
17  > received fitness reimbursements pursuant to Fidelity Brokerage Services'
    > Fitness Reimbursement Program and worked overtime during the pay period in
18  > which the fitness reimbursement was paid.  (Dkt. 51.)

19      The Advisory Committee Notes to the 2018 Amendments to Rule 23 (hereafter "Advisory

20  Committee Notes") state: "If the court has already certified a class, the only information ordinarily

21  necessary is whether the proposed settlement calls for any change in the class certified, or of the

22  claims, defenses, or issues regarding which certification was granted."

23      The settlement here specifically defines the Class to be "the Rule 23 Class as defined in

24  Docket Entry No. 51 in the Litigation."  (SA ¶ 1.1)  The only difference is that the settlement does

25  not provide anything unique for the former employee subclass that was also certified in Docket

26  Entry No. 51.  The only purpose of the subclass was to allow former employees to seek waiting time

27  penalties under Labor Code section 203 if the case were to proceed to trial.  But, based on guidance

28

9

1   in the case law that settlement funds should be allocated to damages before penalties (*see e.g.*

2   *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 964 (9th Cir. 2009)), and the challenges Plaintiff would

3   face establishing such a claim (*see e.g. Alonzo v. Maximus, Inc.*, 832 F. Supp. 2d 1122 (C.D. Cal.

4   2011)), Class counsel chose to negotiate a resolution that would pay out all Class members based on

5   their actual and quantifiable damages, i.e., unpaid wages.  (Baker Decl. ¶ 19.)

6        Furthermore, the settlement releases "only the claims pled in the complaint and other claims

7   seeking substantially the same lost wages," which is the standard required by this Court.  *Saravia v.*

8   *Dynamex Operations West, LLC,* 2017 WL 1295069, at *2 (N.D. Cal., Apr. 7, 2017).  The release

9   also identifies the statutory provisions violated by the allegations: "California Labor Code sections

10  201, 202, 203, 204, 226, 246, 510 & 1194, California Labor Code section 2698 *et seq.*, California

11  Business and Professions Code section 17200 *et seq.*, any applicable California Industrial Welfare

12  Commission Wage Order, and the federal Fair Labor Standards Act, the Portal to Portal Act."  (SA ¶

13  1.4)  The Agreement does not attempt to release all claims that "could have been brought" or

14  otherwise expand the scope of the claims from that alleged.

15  **B.      The Settlement Meets The Standards For Preliminary Approval**
            **Under Rule 23(e), the Northern District's Procedural Guidance And**
16          **This Court's Standing Order**

17        FRCP Rule 23(e) requires judicial approval of a class action settlement.  And while case law

18  has recognized that "the approval of a class action settlement takes place in two stages" and that in

19  the first stage, the Court "preliminarily approves the Settlement pending a fairness hearing… and

20  authorizes notice to the class" (*E.g. Murillo v. Pacific Gas & Elec. Co.*, 266 F.R.D. 468, 473 (E.D.

21  Cal. 2010)), the FRCP only recently confirmed this process.  *See* Rule 23(a), as amended December

22  1, 2018 ("The parties must provide the court with information sufficient to enable it to determine

23  whether to give notice of the proposal to the class"; Advisory Committee Notes ("This decision has

24  been called "preliminary approval" of the proposed class certification in Rule 23(b)(3) actions.").

25  The amended Rule 23(e) also boils down the factors considered across the country at the preliminary

26  approval stage into the central issue of whether "the court will likely be able to… approve the

27  proposal under Rule 23(e)(2)," i.e. grant final approval.  While the issue to be decided is "sufficient

28

likelihood" of granting final approval, and the Advisory Committee Notes state that the "parties may supply information to the court on any topic that they regard as pertinent to the determination whether the proposal is fair, reasonable, and adequate," the Advisory Committee Notes on subdivision (e)(1) also provide a streamlined list of issues to focus on at the preliminary approval stage.  This motion therefore structures around those issues, which are:

1.  The "extent and type of benefits that the settlement will confer on the members of the class."

2.  The plans for distribution of any funds left unclaimed.

3.  The likely range of litigated outcomes and the "risks that might attend full litigation."

4.  The "extent of discovery completed in the litigation or in parallel actions."

5.  The existence of other pending or anticipated litigation on behalf of class members involving claims that would be released under the proposal.

6.  "The proposed handling of an award of attorney's fees under Rule 23(h)."[9]

Each of these factors may inform the decision of "whether the proposed settlement falls within the range of possible approval," meaning what could be found to be "fair, adequate, and reasonable." *Williams v. Costco Wholesale Corp.*, 2010 WL 761122, *5 (S.D. Cal. 2010); *accord Class Plaintiffs v. City of Seattle,* 955 F.2d 1268, 1276 (9th Cir. 2010).  Moreover, because parties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in the litigation, courts generally favor approval of settlement rather than continuation of litigation.  *In re Pac Enters Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995); *In re Heritage Bond Litigation,* 2005 WL 1594403, *2 (C.D. Cal. 2005) ("the Court's intrusion upon what is otherwise a private consensual agreement negotiated between the parties to a lawsuit must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken

---

[9] This list does not a significantly depart from the standard often previously used in this district. *In re Tableware Antitrust Litigation,* 484 F.Supp.2d 1078, 1080 (N.D. Cal. 2007) (The settlement: (1) is the product of serious, informed, non-collusive negotiations; (2) has no obvious deficiencies; (3) does not improperly grant preferential treatment to class representatives or segments of the class; and (4) falls within the range of possible approval.)

as a whole, is fair, reasonable and adequate to all concerned.").

As discussed below, the settlement presented here more than meets these standards.

### 1. The Class/Collective Greatly Benefits From $1,200,000 And Fidelity's Changing Its Pay Practices

The first factor identified by the Advisory Committee for assessing preliminary approval is the "extent and type of benefits that the settlement will confer on the members of the class."

Here, Fidelity has agreed to a $1.2 million non-reversionary settlement. *E.g., Minor v. FedEx Office & Print Services, Inc.*, 2013 WL 503268, *4 (N.D. Cal. 2013) ("reversionary clauses often raise concerns about whether the settlement is in the best interests of the class.")  And, as discussed below, all of the net settlement amount will be distributed to the Class and Collective members without any going to a *cy pres* recipient.  Accordingly, the entire $1.2 million will go to either the employees affected by Fidelity's alleged wrongs or those who made it possible for the employees to recover under this settlement. [10]

Second, each Class member receives a fair recovery.  The Settlement Agreement provides for a pro rata distribution, but with Class members getting ten percent more than FLSA Collective members.  The 10% higher recovery is appropriate because in Class Counsel's view the potential violations of Labor Code section 226 have a higher value (up to $4,000 per employee) for California class members than the potential for liquidated damages under the FLSA for Collective members and because they are releasing claims under PAGA claims and potentially the FLSA.  (Baker Decl. fn 1.)  Accordingly, this is not a case of "singling out a large group of non-named plaintiff class members for higher payments without regard to the strength of their claims." *Staton v. Boeing Co.*, 327 F.3d 938, 977 (9th Cir. 2003).  Rather, the parties valued the different claims and ensured that class members receive settlements consistent with that value.  *In re Global Crossing Securities and ERISA Litigation*, 225 F.R.D. 436, 461 (S.D.N.Y. 2004).   ("When formulated by competent and experienced class counsel, an allocation plan need have only a reasonable, rational basis. . . .").

---

[10] The monetary benefits to the class here also compare favorably to past settlements in cases litigated by Class Counsel involving financial institutions.  Pursuant to the direction in the Northern District's Procedural Guidance for Class Action Settlements (Updated November 1, 2018) (hereafter "Procedural Guidance"), the Baker Declaration ¶ 28 contains a chart setting forth that comparison.

In addition to the settlement payout, current-employee Class members also receive the benefit that their future paychecks will be higher based on Fidelity's changing its pay practices.

All these reasons support granting preliminary approval.

### 2.    All Funds Will Be Distributed To Class Members

The "plans for distribution of any funds left unclaimed" factor also supports preliminary approval because all funds will be distributed to Class/Collective members under the settlement.

As an initial consideration, the Settlement Agreement requires extensive efforts to get Class/Collective members to cash their settlement checks.  After going through the address updating procedures in connection with sending the Notices, the Claims Administrator will send the checks and it will follow up with a postcard reminder to anyone who has not cashed their checks after 30 days.  After 60 days the Administrator will then issue and distribute new checks for anyone who did not cash the first check.  This second check will also remain live for 60 days.  (SA ¶ 2.6.3)

If, after all that, a Class/Collective member still has not cashed his or her check, the Claims Administrator and Fidelity will re-distribute the funds from any uncashed checks pro rata to currently employed Class/Collective members through its payroll system.  The Agreement has no reserve fund.  To ensure this final distribution, the Claims Administrator will inform Class Counsel of the total amount of money from uncashed checks that will be distributed through Fidelity's payroll system, and once this process is complete, Fidelity will provide Class Counsel a declaration confirming that such distribution took place pursuant to the Settlement's terms.[11]  (*Id.*)

### 3.    The Potential Recovery Of Damages In This Action Is Less Than The Gross Settlement Amount And Penalties Would Be Difficult To Recover

The "likely range of litigated outcomes" compared to the "risks that might attend full litigation" also greatly supports preliminary approval.

As discussed above, the parties have calculated the amounts of additional compensation that the Class members would have received if Fidelity had calculated the regular rate of pay for overtime by using the *Alvarado* formula for bonuses and included the student loan and fitness

---

[11] Class Counsel will also provide the Court with the Post-Distribution Accounting required in the Procedural Guidance.

MOTION FOR PRELIMINARY APPROVAL OF A CLASS ACTION SETTLEMENT AND APPROVAL OF A COLLECTIVE ACTION SETTLEMENT UNDER THE FLSA (Case No. 3:17-cv-06027)

reimbursement amounts throughout the Class period.  That amount totals $682,200.  (Baker Decl. Ex. 3, ¶ 8.) [12]  Added together with the amounts the FLSA collective members would have been paid if Fidelity had included student loan and fitness reimbursement in the overtime calculation nationwide, equals a grand total of $1,071,404.  (*Id.*)  This is the important number because it is the estimated compensatory damages that should be weighed against the value received by the settlement.  *See, e.g., Rodriguez,* 563 F.3d at 964 (noting that courts determine the fairness of class action settlement based on how it compensates for past injuries).  To consider penalties or other punitive measures that could result, presupposes that the plaintiff prevails at the end of trial, which undercuts the point of a negotiated resolution.  *See Id*.  Accordingly, the guaranteed gross settlement amount of $1,200,000 considerably exceeds the amount of all damages through October 1, 2018, the end of the settlement class period. [13]  Moreover, if the Court were to grant the full deductions that Class Counsel and Plaintiff plan to request, $538,711 will actually be distributed to the Class members, which is a guaranteed 79 cents on the dollar recovery.[14]  (Baker Decl. Ex. 3, ¶ 11.)

"[T]he district judge's duty in a class action settlement situation [is] to estimate the *litigation value* [not the undiscounted, pie-in-the-sky value] of the claims of the class and determine whether the settlement is a reasonable approximation of that value." *Mirfasihi v. Fleet Mortg. Corp.*, 356

---

[12] $642,106 is the difference between paying bonus overtime adjustments under the DOL formula, as Fidelity did, and paying them under the *Alvarado* formula as Plaintiff contends was required. Thus, only $40,094 of damages resulted from omitting the student loan and fitness reimbursements for the overtime rate calculation.  (Baker Decl. Ex. 3, ¶ 8.)

[13] It is appropriate to consider the gross award (*before* deductions) in comparing the litigation value against the settlement award.  First, if this was a single-plaintiff case, there would be a contingency agreement, and a contingency-fee plaintiff normally pays a percentage of any award to his or her counsel *regardless of fee shifting.*  Second, it is appropriate to pay fees out of a common fund, even in a fee-shifting case, "to avoid the unjust enrichment of those who benefit from the fund that is created, protected, or increased by litigation and who otherwise bear none of the litigation costs."  *Sobel v. Hertz Corporation*, 2014 WL 5063397, *5 (D. Nev. 2014).  Third, even if this case proceeded to judgment, and plaintiff was entirely successful, it is likely that, while some portion of plaintiff's fee would be paid directly by defendant, other portions would *still* be paid out of the common fund to account for counsel's risk in bringing suit and to ensure "that absent class members share in the cost of litigation."  *Id.* at *8; *Savani v. URS Professional Solutions LLC*, 2014 WL 172503, *9 (D.S.C. 2014).

[14] $279,402 will also be distributed to the <u>Collective</u> members, giving them a 72 cents on the dollar guaranteed net recovery, and equaling an overall 76 cents on the dollar recovery for Class and Collective members.  (Baker Decl. Ex. 3, ¶ 11.)

F.3d 781, 786 (7th Cir. 2004) (emphasis added).  "[I]t is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements. The proposed settlement is not to be judged against a hypothetical or speculative measure of what might have been achieved by the negotiators." *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998).   The fairness determination does not depend on a mathematical equation yielding a particularized sum.  Rather it depends on the strengths and weaknesses of the plaintiff's case.  *In re Global Crossing*, 225 F.R.D. at 461; *Adoma v. Univ. of Phoenix, Inc.*, 913 F. Supp. 2d 964, 975 (E.D. Cal. 2012) (courts "evaluate objectively the strengths and weaknesses inherent in the litigation and the impact of those considerations on the parties' decisions to reach these agreements.").

If the litigation were to go forward instead of settling, Plaintiff would seek to establish her claims to recover the owed compensation and to recover the potentially implicated penalties but she would face considerable risk in doing so.  Those risks are discussed below.

### a. Bonus Overtime Claim

At this time, Plaintiff assesses little more than a fifty percent chance of establishing that Fidelity was required to pay its California employees overtime pursuant to *Alvarado*.  Fidelity has two good arguments that *Alvarado* does not apply to its bonuses.

First, "discretionary" bonuses need not be included in the regular rate at all.  *Alvarado*, 4 Cal. 5th at 553. A bonus is discretionary when the fact and the amount of payment remain within the employer's control up to the point of payment. *See e.g. Alonzo*, 832 F. Supp. 2d at 1130.  Fidelity's Compensation Plans specifically state: "Participant payouts can range between *0% - 200%* of [each employee's applicable bonus] pool, due to manager discretion in distributing the overall pool of dollars." (*See* Morris Decl. Ex. 1, p. 5.)  Plaintiff would seek to overcome that language by arguing that Fidelity regularly paid the bonuses, making them non-discretionary, as some courts have held (*see e.g. Herman v. Anderson Floor Co.*, 11 F. Supp. 2d 1038, 1039 (E.D. Wis. 1998) (requiring bonuses granted 76-90% of time included in regular rate)), but the plan language would be an impediment to requiring Fidelity to include the bonuses in its overtime regular rate calculations.

Second, Plaintiff would also have to prove the bonus was a so-called flat-sum bonus and not

1    a production bonus under *Alvarado*.  Class members' bonuses are most commonly based on "results

2    from their Investor Center's Net Promoter Score (NPS) compared with the Branch National median

3    score." (Morris Decl. Ex. 1, p. 5.)  Plaintiff argues this is a customer satisfaction score, with no

4    correlation between raising those scores and working more hours.  Fidelity argues its managers base

5    their assessments on each employee's effort and quality of service across all hours worked by the

6    employee—regular and overtime, so it is a production bonus.  Plaintiff believes she has the better

7    argument on this issue but there is risk.  (Baker Decl. ¶ 25.)

8                    **b.    Reimbursement Omission Overtime Claim**

9            Plaintiff believes her claims that Fidelity was required to include the payments made under

10   the student loan and fitness reimbursement in the regular rate of pay for calculating overtime

11   compensation are stronger than the bonus overtime claim, but not beyond challenge.  The Class

12   claim based on omitting the reimbursements from the regular rate also has only 1/16 the value of the

13   Class's bonus claim.  (Baker Decl. ¶ 21.)  Fidelity argues that neither student loan nor fitness

14   reimbursements are payments "made as compensation for . . . hours of employment," so those

15   payments fall within the section 207(e)(2) exemption from the regular rate calculation under the

16   FLSA (which California would also likely follow).  Plaintiff argues that *Adoma*, 779 F. Supp. 2d at

17   1129, is highly on-point authority that student loan reimbursements do not fall in the section

18   207(e)(2) exemption.  She further contends that the holding in *Flores v. City of San Gabriel,* 824

19   F.3d 890, 898 (9th Cir. 2016), rejecting the employer's attempt to exclude its cash-in-lieu of benefits

20   payments from the regular rate, further supports her claims.  But *Adoma* is not binding authority and

21   the holding in *Flores* may be impacted by the Supreme Court's subsequent instruction in *Encino*

22   *Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2131 (2016), to stop "invoking the made-up canon that

23   courts must narrowly construe the FLSA exemptions." (Baker Decl. ¶ 26.)  So there is risk here too.'

24                    **c.    Potentially Implicated Penalties By The Class Claims**

25           Plaintiff currently believes she has a low chance of recovering certain penalties based on the

26   alleged Class claims.  While Plaintiff likes her chances to recover damages, it is a whole other series

27   of hurdles to establish that Fidelity should have to pay penalties on top of the amounts that would

28

have been owed for its alleged transgressions.  For example, Fidelity has a strong argument that a good faith dispute prevents section 203 penalties.  *See e.g. Alonzo*, 832 F. Supp. 2d at 1133 (refusing to award section 203 penalties on regular rate claims where defendant established the existence of a "good faith dispute" regarding whether it had to include individual bonus award payments in the calculation of the regular rate).  Fidelity's good-faith argument may also prevent the Collective from recovering liquidated damages because if "the employer shows to the satisfaction of the court that the act or omission … was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act … the court may, in its sound discretion, award no liquidated damages…." 29 U.S.C. § 260.  Similarly, in remanding a case in which the plaintiff alleged that the employer paid overtime but neglected to include commissions in the calculation, this Court held "[n]othing in Section 226.3 or Section 226(a) provides that the requirements for a wage-deduction statement or for maintaining records are violated merely because the statements and records, although otherwise provided and maintained, included an error in calculating a line item."  *Smith v. Lux Retail North America, Inc*., 2013 WL 2932243, at *4 (N.D. Cal., June 13, 2013).  Plaintiff must distinguish or overcome this reasoning in order to receive statutory penalties under Labor Code § 226.  (Baker Decl. ¶ 27.)  This Court's comments in *Smith*, at *4, also cause Class Counsel to conclude it even further unlikely that this Court would award multiple penalties for Fidelity's alleged failure to properly calculate the regular rate:

> Another necessary but equally flawed assumption undergirding the Luxottica calculation is the stacking of penalties. For the single mistake of failing to include commissions in the overtime base, plaintiff has asserted *five* (count them, five) separate labor code violations that could lead to statutory penalties. … But is it plausible that we would really pile one penalty on another for a single substantive wrong?

### d.     PAGA Claim

The only claims asserted under the PAGA, that were not also Class claims were those for insufficient notice of sick leave in violation of Labor Code section 246 and that the delay in issuing the bonus adjustments violated Labor Code section 204.  Plaintiff now allocates little to no value to the section 246 claim because case law to date currently rejects it. *Stearne v. Heartland Payment Systems LLC*, 2018 WL 746492, at *2 (E.D. Cal., Feb. 6, 2018) (dismissing claims because section

17

246 limits its remedies to equitable, injunctive, or restitutionary relief when suing on behalf of the public); *Titus v. McLane Foodservice, Inc.,* 2016 WL 4797497, *5 (E.D. Cal. Sep. 13, 2016) (same and because PAGA penalties are not available for notice violations per § 2699(g)(2)).  Moreover, Plaintiff would also have trouble recovering PAGA penalties for a section 204 violation because the California Division of Labor Standards Enforcement ("DLSE") Manual section 5.2.4 provides that "Base salary must be paid pursuant to the provisions of Labor Code § 204; however, certain exceptions are provided in the statute for specified extraordinary wages.  For instance, if a bonus … is calculated on a quarterly basis, the bonus need not be paid until the regular payday following the date upon which the bonus is calculated," and Plaintiff has no reason to believe Fidelity did not pay its bonuses on the schedule set forth in the Compensation Plans.  (*See* Morris Decl. Ex. 1, p. 6.)  The parties therefore submit that $20,000 is a reasonable amount to settle the PAGA claim (75% of which will be paid to the LWDA by the $15,000 payment set forth in the settlement agreement), which is 1.6 percent of the gross settlement.  *See, e.g., Franco v. Ruiz Food Products, Inc.*, 2012 WL 5941801 (E.D. Cal. 2012) (approving PAGA allocation of $10,000 against a settlement of $2.5 million (.4 %)); *Garibaldi v. Bank of America, N.A.,* Case No. 13-cv-02223 (Dkt. 108) (N.D. Cal. August 8, 2015) (approving PAGA allocation of $30,000 against a settlement of 9.5 million (.3 %)); *Chu v. Wells Fargo Investments, LLC*, 2011 WL 672645 (N.D. Cal. 2011)  (approving PAGA allocation of $10,000 against a settlement of 6.9 million (.1 %)).  (Baker Decl. ¶ 27.)

   **4.    Plaintiff Performed The Necessary Due Diligence, Including Formal Discovery, To Assess And Resolve This Case Without Wasting Class Resources**

   The "extent of discovery completed" factor also supports preliminary approval here.  In assessing the extent of discovery, the stage of the case, and the views of counsel, the Court must evaluate whether "the parties have sufficient information to make an informed decision about settlement."  *Linney,* 151 F.3d at 1239.  If they do, then "the recommendations of plaintiff's counsel should be given a presumption of reasonableness."  *In re Omnivision Technologies, Inc.*, 559 F.Supp.2d 1036, 1043 (N.D. Cal. 2008).  Indeed "where a class settlement has been reached after meaningful discovery, after arm's length negotiation, conducted by capable counsel, it is

1    presumptively fair." *Cicero v. DirecTV, Inc.*, 2010 WL 2991486, at *3 (C.D. Cal. July 27, 2010). As

2    shown in the above discussion about likelihood of prevailing on the claims, this case would largely

3    turn on the law's application to the facts, not extensive factual disputes.

4          Plaintiff conducted an independent investigation and formal discovery.  The independent

5    investigation allowed her to make her initial disclosures in February, supplemental disclosures in

6    March and then a document production on April 30, 2018, which included over 200 pages of Fidelity

7    policies in addition to documents related to Plaintiff.  Plaintiff served her interrogatories, requests for

8    admission and requests for production of documents in February 2018.  Fidelity timely responded,

9    but largely objected.  An extensive meet and confer process followed with Fidelity serving several

10   sets of supplemental responses.  The meet and confer efforts also led to Fidelity making at least eight

11   document productions, on March 20, May 2, May 9, July 17, July 19, July 27, July 30, and August 2.

12   The produced documents included the relevant policies, dozens of compensation plans, wage

13   statements and many massive spreadsheets that included all the financial data related to overtime,

14   bonuses, student loan and fitness reimbursements, and other information.  (Baker Decl. ¶ 8.)

15         Because Fidelity then stipulated to key facts and certification (Dkt. 51) and had produced the

16   data needed to calculate potential damages, the case was ripe to settle.  Judge Spero guided the

17   parties to the reached resolution at their September 5, 2018 settlement conference.  *Villegas v. J.P.*

18   *Morgan Chase & Co.*, 2012 WL 5878390, at *6 (N.D. Cal. Nov. 21, 2012) (use of an experienced

19   neutral "tends to support the conclusion that the settlement process was not collusive.").  Only after

20   the pleadings were settled, and Fidelity provided Class Counsel with the documents and data

21   necessary to value the case, was a settlement reached, and then only with the help of Judge Spero.

22            **5.    The Settlement Specifically Limits The Release And Explains Its**
                      **Overlap With The One Other Pending Related Lawsuit**
23

24         The Settlement's treatment of "other pending or anticipated litigation on behalf of class

25   members" also supports preliminary approval.  Fidelity is also a defendant in the case *Reynolds et al.*

26   *v. Fidelity Investments Operations Company, Inc. et al.*, Case No. 1:18-CV-00423-CCE-LPA (M.D.

27   N.C.).  (See Dkt. 56.)  As stated in Fidelity's Notice of Pendency of Other Action:

28

MOTION FOR PRELIMINARY APPROVAL OF A CLASS ACTION SETTLEMENT AND APPROVAL OF A
COLLECTIVE ACTION SETTLEMENT UNDER THE FLSA (Case No. 3:17-cv-06027)

1
2
3
4
5
6

the claims asserted in *Reynolds* overlap only partially with those asserted in this case, and the putative class and putative collective in *Reynolds* overlap only partially with the class and collective already certified in this matter. For example, the allegations in *Reynolds* primarily focus on the claim for off-the-clock work, and this claim is not asserted here in *Morris*. Additionally, the putative FLSA collective action in *Reynolds* includes only call center employees with responsibility for communicating with customers, but because Fidelity does not operate any call centers in California, none of the members of the putative class or collective action in *Reynolds* has any claims under California law. (*Id.*)

7
8
9
10
11
12
13

Nevertheless, the *Reynolds* action includes a claim that the student loan and fitness reimbursements should be included in the regular rate, so the release here may resolve part of a claim in *Reynolds*. (*Id.*) But Plaintiff has ensured that Fidelity cannot use the settlement here to try to expand the scope of this action to get additional releases in *Reynolds*. The Settlement specifically states that neither the California nor the FLSA release extends to claims in that lawsuit that were beyond the facts alleged here and specifically excludes the primary claim in *Reynolds* "for unpaid pre-shift work asserted in." (SA ¶¶ 1.4; 1.27) This factor is, therefore, also met.

14
15

### 6.   The Settlement Leaves The Award Of Attorneys' Fees, Costs And Enhancement Payment Entirely To Court's Discretion And Assumes Only The 25% Benchmark For Estimating Class Member Recoveries

16
17
18
19
20
21

The requested attorneys' fees is the final consideration. This factor supports preliminary approval here because Class counsel only intends to seek the 25% benchmark in the Ninth Circuit, or $300,000, although courts often award higher amounts in wage and hour litigation like this. *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1029 (9th Cir. 1998); *Cicero,* 2010 WL 2991486, at *6 ("courts usually award attorneys' fees in the 30-40% range in wage and hour class actions that result in recovery of a common fund under $10 million.").

22
23
24
25
26
27
28

Class counsel has billed more than 349 hours on this case to date. Class Counsel's current lodestar based on these hours is $226,287, so the planned request for $300,000 in fees currently equals a 1.3 multiplier. (Baker Decl. ¶ 29.) There will of course still be more work on this case. Accordingly, the multiplier ultimately will be even less than 1.3, which is already at the bottom end of range commonly approved. "Multipliers ranging from one to four are frequently awarded in common fund cases…." *Lazarin v. Pro Unlimited, Inc.*, 2013 WL 3541217, *8 (N.D. Cal. 2013).

20

1    Class counsel also will seek reimbursement of actual costs, up to $20,000.  And Plaintiff will

2  request a $5,000 enhancement award for her work in this case.  Plaintiff has submitted a declaration

3  in support of this motion, which touches on some of the bases to award her an enhancement payment

4  (Baker Decl. Ex. 5), but Plaintiff will otherwise save the discussion of these deductions for the

5  motion requesting them, which will be set for hearing at the same time as the final approval motion.

6    As discussed above, the Class notices will include an estimated amount of recovery based on

7  these deductions, but a recalculation will be done after final approval so that if the Court awards a

8  lesser amount, those funds will be distributed pro rata to the Class/Collective.

9    In sum, the Court should preliminarily approve the Class settlement because each of the

10  above factors indicates that the Court will be able to grant final approval.

11    **C.    The FLSA Settlement and Release Is Fair and Reasonable**

12    "Because the Ninth Circuit has not established a standard for district courts to follow when

13  evaluating an FLSA settlement, California district courts frequently apply the standard established

14  by the Eleventh Circuit in *Lynn's Food Stores, Inc. v. U.S. By and Through U.S. Dep't of Labor*,

15  679 F.2d 1350, 1352 (11th Cir. 1982)."  *Ferreri v. Bask Technology, Inc.*, 2016 WL 6833927, at

16  *3–4 (S.D. Cal., Nov. 21, 2016) (citing *Dunn v. Teachers Ins. & Annuity Ass'n of Am.*, 2016 WL

17  153266, at *3 (N.D. Cal. Jan. 13, 2016).  "Under that standard, the relevant considerations are

18  whether the named plaintiff is 'similarly situated'[15] to the collective members and whether the

19  settlement constitutes 'a fair and reasonable resolution of a bona fide dispute over FLSA

20  provisions.'"  *Id.*; *see also Lynn's Food Stores*, 679 F.2d at 1354; *Yue Zhou v. Wang's Restaurant*,

21  2007 WL 2298046, *1 (N.D. Cal. Aug. 8, 2007) (A district court presented with a proposed

22  settlement of FLSA claims "must determine whether the settlement is a fair and reasonable

23  resolution of a bona fide dispute.... 'If a settlement in an employee FLSA suit does reflect a

24  reasonable compromise over issues, such as FLSA coverage or computation of back wages, that

25  are actually in dispute[,] ... the district court [may] approve the settlement in order to promote the

26  ───────────────

27  [15] In the settlement context it is clear that the defendant will not seek decertification of the
conditionally certified collective so courts need not consider the second step in the FLSA

28  certification process.  *Millan v. Cascade Water Services, Inc.*, 310 F.R.D. 593, 607 (E.D. Cal. 2015).

policy of encouraging settlement of litigation.").  The district court's "[o]bligation is not to act as

caretaker but as gatekeeper," so that FLSA "settlements do not undermine the Act's purposes."

*Goodwin v. Citywide Home Loans, Inc.*, 2015 WL 12868143, at *2 (C.D. Cal. Nov. 2, 2015).

Settlements that reflect a fair and reasonable compromise of issues that are actually in dispute may

be approved to promote the efficiency of encouraging settlement of litigation.  *McKeen-Chaplin v.

Franklin Am. Mortg. Co.*, 2012 WL 6629608, at *2 (N.D. Cal. Dec. 19, 2012).

As discussed above, the parties have a bona fide dispute regarding overtime wages, and the

settlement represents a reasonable compromise of those claims.  Indeed, the above showing that

supported preliminary approval of the Class settlement establishes that the FLSA settlement

should also be approved.  *Millan v. Cascade Water Services, Inc.*, 2016 WL 3077710, at *3 (E.D.

Cal. Nov. 21, 2016) ("many courts begin with the well-established criteria for assessing whether a

class action settlement is fair, reasonable and adequate under [Rule] 23(e) and reason by analogy

to the FLSA context."); *Otey v. Crowdflower, Inc.*, 2014 WL 1477630, at *11 (N.D. Cal. Apr. 15,

2014) ("[T]he factors that courts consider when evaluating a collective action settlement are

essentially the same as those that courts consider when evaluating a Rule 23 settlement.").  This is

especially true because courts have a "considerably less stringent" obligation to ensure fairness of

a FLSA collective settlement than a Rule 23 class because parties who do not opt in are not bound

by the settlement. *Millan v. Cascade Water Services, Inc.,* 310 F.R.D. at 607.

Moreover, courts in the Northern District have approved settlements as reasonable when

they recover 70% or more of the alleged damages.  *Slavkov v. Fast Water Heater Partners I, LP*,

2017 WL 3834873, at *1 (N.D. Cal., July 25, 2017); *Lee v. The Timberland Co.,* 2008 WL

2492295, at *2 (N.D. Cal. June 19, 2008) (70% of FLSA damages).  The settlement here meets

this standard with the FLSA collective members recovering more than 100% (gross) and 72% of

their potential damages (anticipated net).

For all these reasons, the Court should approve the FLSA Collective settlement.

**D.    The Settlement Administrator**

Class counsel solicited bids from four administrators, including Rust Consulting, which was

---

22

ultimately chosen.  The first round of bids concerned just mailing of the notice, but then subsequent

bids were solicited to include providing a website as well.  Class Counsel decided the cost to benefit

ratio of adding the website made sense.  Class counsel received bids that were both higher and lower

than Rust's original bid.  Rust then agreed to match the low-bidder.  After selecting Rust, we then

worked out the details of the administration and Rust's final bid agreed to cap its fee at $41,887.

Class Counsel was pleased to engage Rust at this rate, given its strong reputation administering

settlements, although it has not previously engaged Rust.  (Baker Decl. ¶ 29.)

Under the Settlement, the parties request that the $41,887 be paid out of the $1,200,000

common fund.  That amount is reasonable because only .03% of the settlement sum is used to pay

for the extensive efforts under the settlement that will be employed to best ensure that

Class/Collective members actually receive their settlement payments.   (*Id.*)

### E.      Class, Collective and CAFA Notice

The Settlement Agreement attaches the proposed Class Notice as Exhibit 3, which

simultaneously provides the notice required under F.R.C.P. 23(c)(2)(B) and 23(e)(1), the propriety

of which the recent amendments to Rule 23 has confirmed.  (*See* Advisory Committee Notes.)[16]

Pursuant to F.R.C.P. 23(c)(2)(B), class members must be provided with the best notice that is

practicable under the circumstances.

The proposed Notice in this case satisfies the above standard.  The notice is clearly written,

in plain English, and it "describes the terms of the settlement in sufficient detail to alert those with

adverse viewpoints to investigate and come forward to be heard."  *Rodriguez*, 563 F.3d at 962.  In-

line with the Procedural Guidance, the class notice also contains: Class Counsel's contact

information (p. 3); direction to a website that posts the important case documents (pp. 4 and 8);

instructions on how to access the case docket via PACER or in person, including the model

language set forth in the Procedural Guidance (pp. 4 and 8); the date of the final approval hearing,

---

[16] In the stipulation to certify the Rule 23 Class, the parties explained: "[t]o avoid the
administration cost associated with multiple mailings and to preserve class resources, Plaintiff
and Fidelity Brokerage Services stipulate to postpone notice procedures until after the Mandatory
Settlement Conference with Magistrate Judge Spero on September 5, 2018."  (Dkt. 51.)

23

1   notice that the date may change and direction of where to check for an updated date (p. 8);

2   individual estimated settlement recovery amounts (p. 5); instructions on how to opt out via the

3   procedures set forth in the Procedural Guidance (p. 6); and instructions on how to object to the

4   settlement, including the model language set forth in the Procedural Guidance (pp. 6-7).

5          Under the Settlement Agreement, Fidelity must provide the Claims Administrator with the

6   name, last-known address, and social security number of each Class member.  (SA ¶ 2.4.3)  The

7   Claims Administrator must send the notice to each Class member by first class mail after

8   undertaking measures to verify and updated addresses.  (SA ¶ 2.4.4)  If a notice is returned to the

9   Claims Administrator as undeliverable, it must then undertake a second round of address verification

10  measures and, if a new address is ascertained, re-send that Notice within five days.  (SA ¶ 2.4.7)  To

11  increase its effectiveness, the Class Notice will also provide a website address that includes the key

12  case documents.  The website will be maintained by the Claims Administrator until 30 days after the

13  first distribution of funds. (SA ¶ 2.4.8)  Class Counsel will also establish a similar webpage on its

14  website. (SA ¶ 2.11.20)  In the Claims Administrator's experience, notice distributed in by the above

15  process successfully reaches more than 90% of class members. (Baker Decl., Ex. 2, ¶ 12.) [17]

16         The parties agreed to a FLSA Collective notice process designed to follow the Court's

17  guidance in its standing Order Re Factors to be Evaluated for any Proposed Class Settlement, which

18  states that "usually the release must extend only to those who receive money for the release."  Under

19  the Agreement, a short notice will be attached to a live check sent to each member of the FLSA

20  Collective, which informs the recipient that cashing the check constitutes joining the action and

21  submitting to the release.  The short notice will also direct the Collective members to a long-form

22  notice on the settlement website, providing them further information.  (The Settlement Agreement

23

24  [17] Class counsel also has experience with classes of financial institution employees and has found
    that traditional mail coupled with a website has been highly effective at providing notice.  Class
25  counsel considered the advisement in Rule 23 that the notice "may be one or more of…United
    States mail, electronic means or other appropriate means."  Class counsel also considered retaining
26  a class notice expert, but decided based on past experience with financial sector employees, that
    those measures were outweighed by the cost to the Class.  Class Counsel has also experienced
27  employees' objections to their email addresses being used without their permission to send class
    settlement related communications.  (Baker Decl. ¶ 18.)
28
                                                      24

1   attaches the proposed short-form and long-form FLSA Collective Notices as Exhibits 4 and 5.)  This

2   procedure saves the resources of two rounds of mailings and aims to get the Collective members

3   attention by including a live check.  Several courts have also approved this strategy to get the money

4   into the pockets of each person subject to the release.  *Lazarin*, 2013 WL 3541217 at *4 (approving

5   class action settlement in hybrid FLSA/state law class action without separate FLSA notice, where

6   collective members opt-in and release their claims under the FLSA by cashing their settlement

7   checks); *Franco,* 2012 WL 5941801, at *24 (same); *but see* Kempen v. Matheson Tri-Gas, Inc.*, 2016

8   WL 4073336, at *9 (N.D. Cal., Aug. 1, 2016) (holding that consent in writing must be filed with the

9   court to join FLSA action); *Johnson v. Quantum Learning Network, Inc.*, 2016 WL 8729941, at *1

10  (N.D. Cal., Aug. 12, 2016) (same).  And, as stated above, the purpose of the direct mailing of checks

11  is to further this Court's direction to limit releases to individuals who receive payment.

12      Finally, the Agreement requires Fidelity to submit the required CAFA notice.  (SA ¶ 2.11.8)

13      **F.    Proposed Orders**

14      The parties have also filed two proposed orders, one approving the Class settlement and the

15  other approving the FLSA Collective settlement, which are also Exhibit 1 and 2 to the Settlement

16  Agreement.  Notably, the final approval hearing for the Class settlement is designed to occur 60 days

17  after the final approval motion and motion for fees is filed so that Class members have 35 days to

18  consider whether to object or opt-out after they have the opportunity to review those motions and the

19  parties have time to respond to any filed objections.

20  **VII.   CONCLUSION**

21      Based on the foregoing, Plaintiff respectfully moves this Court to enter the [Proposed] Orders

22  submitted with this motion.

23                      Respectfully submitted,

24  Dated:   December 14, 2018

25                      BAKER CURTIS & SCHWARTZ, P.C.

26                  By: _____/s/_____
                        Chris Baker
27                      Attorneys for Adrian Morris and Class Counsel

28